**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **ROSA HILL,** Personal Representative of the **ESTATE OF ZACHARY HILL**, <br><br> Plaintiff, <br><br> v. <br><br> **DR. PETER LE, DR. NEAL SOLOMON, DR. JOHN JACKSON, MR. ERIC DYER, DR. ANDREW GRASLEY, JOHN AND JANE DOES 1-5, THE UNITED STATES OF AMERICA**, <br><br> Defendants. | Case No. 3:17-cv-250-SI <br><br> **OPINION AND ORDER** |

Michelle R. Burrows, MICHELLE R. BURROWS PC, 1333 NE Orenco Station Parkway # 525, Hillsboro, OR 97124; Hala Gores, HALA J. GORES PC, 1332 SW Custer Drive, Portland, OR 97219. Of Attorneys for Plaintiff.

Scott Erik Asphaug, Acting United States Attorney, and Kevin Danielson, Assistant United States Attorney, U.S. DEPARTMENT OF JUSTICE, 1000 SW Third Avenue, Suite 600, Portland, OR 97204. Of Attorneys for Defendant United States.

**Michael H. Simon, District Judge.**

Plaintiff's First Amended Complaint asserts three claims—two allege violations of the

Eighth Amendment by the individual defendants and one alleges wrongful death under Oregon

state law against the United States (United States or Defendant). Previously, Plaintiff moved to

dismiss voluntarily all claims against the individual defendants, which the Court granted. This leaves only Plaintiff's wrongful death claim against the United States. The United States moves for summary judgment, arguing that although it has waived its sovereign immunity under the Federal Tort Claims Act (FTCA), that waiver is subject to certain exceptions. The United States asserts that the "discretionary function" exception applies to Plaintiff's wrongful death claim, and thus the Court does not have subject matter jurisdiction over that claim. Plaintiff responds that because Plaintiff's allegations rise to the level of an Eighth Amendment violation, the discretionary function exception does not apply. The United States also argues, in the alternative, that there is no material issue in dispute that the United States committed negligence as alleged by Plaintiff because it was not reasonably foreseeable that Plaintiff's Decedent could have been harmed by the conduct of the United States. For the reasons stated below, the Court denies Defendant's motion.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

The Court takes judicial notice of the docket in two criminal cases involving Plaintiff's Decedent, Mr. Zachary Hill: (1) Mr. Hill's original arrest for bank robbery, Case No. 3:1-cr-495-SI-1; and (2) Mr. Hill's indictment in 2014 for assaulting a federal officer, Case No. 3:14-cr-410-SI.[1] Regarding the bank robbery charge, the Court issued an arrest warrant for Mr. Hill in December 2001. *United States v. Hill*, Case No. 3:1-cr-495-SI, ECF 2, 4. On November 18, 2002, U.S. District Judge Ancer L. Haggerty found Mr. Hill "not guilty of the bank robbery as charged in the indictment by reason of insanity" and committed Mr. Hill to custody for treatment. *Id.*, ECF 27. Mr. Hill spent most of the rest of his life in custody in federal medical facilities, including the U.S. Medical Center for Federal Prisoners in Springfield, Missouri (Springfield). Springfield is a "locked down" federal medical facility.

On July 17, 2007, on the recommendation of the warden at Springfield, Judge Haggerty conditionally released Mr. Hill, imposing a lifetime period of supervision. In 2007 and 2008, Mr. Hill repeatedly violated the terms of his conditional release, was detained pending a revocation hearing, and then was released with more conditions. On July 14, 2008, this cycle ended when Judge Haggerty again committed Plaintiff to the custody of the Bureau of Prisons (BOP). *Id.*, ECF 66, 67.

On September 5, 2013, Judge Haggerty again conditionally released Plaintiff. *Id.*, ECF 69. In January 2014, Mr. Hill was detained for violating the terms of his conditional release.

---

[1] Citations to the Court's electronic filing record in this case are referenced as "ECF" without a preceding case number, and citations to the Court's electronic filing record in Mr. Hill's criminal cases are referenced first by case number (or *id.*) and then by ECF number.

*Id.*, ECF 75. In February 2014, Judge Haggerty found that Mr. Hill violated some terms of his conditional release and added conditions but did not revoke his release. *Id.*, ECF 78, 79. On May 14 and July 31, 2014, the Court issued additional arrest warrants for Mr. Hill for violating the terms of his conditional release. *Id.* ECF 82, 91.

On August 26, 2014, Mr. Hill again violated the terms of his conditional release. *Id.*, ECF 98, 99. His probation officer obtained oral permission from a U.S. District Judge to have Mr. Hill arrested for violating the terms of his conditional release. *Id.* When the U.S. Marshals arrived, Mr. Hill was uncooperative, assaulted a U.S. Deputy Marshal, and had to be tased to be arrested. *Id.* The undersigned district judge issued an arrest warrant for Mr. Hill based on his new violation of his conditional release. *Id.*, ECF 100. Mr. Hill was placed back in BOP's custody. On February 9, 2015, Mr. Hill admitted to violating the terms of his conditional release. *Id.*, ECF 125. The undersigned judge set a revocation hearing for May 18, 2015. *Id.*

Based on Mr. Hill's conduct on August 26th, the government indicted Mr. Hill for assaulting a federal officer. *United States v. Hill*, Case No. 3:14-cr-410-SI, ECF 1. The government filed that indictment on October 7, 2014. *Id.* Mr. Hill entered a plea of guilty on February 9, 2015 (the same day he admitted to violating the terms of his release). *Id.*, ECF 28, 29. The undersigned judge set Mr. Hill's sentencing for May 18, 2015, the same day set for the disposition of Mr. Hill's revocation.

Mr. Hill's repeated supervised release violations over the years included: failing to complete residential drug and alcohol treatment; abusing alcohol; failing to take required urinalysis tests; failing to participate in a resident re-entry program; leaving treatment facilities and home confinement without permission; failing to report; and failing to attend mental health treatment. His violations in August 2014—which led to his arrest during which he assaulted the

federal officer and Mr. Hill's confinement through the date of his death—were failing to report, failing to comply with the requirements relating to his mental health treatment, failing to take a required urinalysis test, using alcohol, and improperly using prescription medication. The probation officer also noted reports of Mr. Hill's engaging in self-harm and potentially posing a danger to others.

Mr. Hill's original confinement in 2002 was at a BOP medical facility in Rochester, New York. He was transferred to Springfield in 2004 because of his "significant aggressive behavior" and "assaultiveness." ECF 78-9 at 6-7. He stayed in Springfield until his conditional release in 2007. When he was returned to custody by Judge Haggerty in 2008, BOP placed Mr. Hill at the Rochester facility, until he again was transferred to Springfield in 2009 after assaulting another person. *Id.* at 7. Throughout his stay in BOP custody, Mr. Hill assaulted inmates and staff, engaged in self harm, including serious suicide attempts, and abused prescription medication. In June 2011, the doctors at Springfield placed Mr. Hill on involuntary psychotropic medication. *Id.* at 8. In Mr. Hill's May 16, 2012 Risk Assessment Review Report, the Risk Assessment Panel stated that "Mr. Hill's history of violence is most disconcerting" and that "[t]ypically when he has been assaultive while here at Springfield there has been no clear provocation[.]" *Id.* at 9.

The evaluators also commented on Mr. Hill's improved control of his aggression after being involuntarily placed on medication but noted that he "continued, however, to engage in a number of other maladaptive behaviors which reflect severe and persisting borderline and anti-social personality traits; self-mutilation by cutting; misuse of medication; lying; and refusing to submit to a random drug test." *Id.* The panel recited that as of the review, Mr. Hill had received at least 44 disciplinary violations while in custody. *Id.* at 5-6 (noting Mr. Hill had received 32

violations as of his 2009 review and listing 12 later violations). The panel concluded that Mr. Hill suffers from "serious chronic mental illness, previously complicated by illicit drug abuse and poor treatment compliance." *Id.* at 11. The panel, however, was "impressed" by Mr. Hill's improvement with involuntary medication. *Id.*

After this risk assessment report had been completed, Mr. Hill was disciplined at least twice for "snorting" (crushing and inhaling) prescription medications, once in July 2012 and again in April 2013. ECF 78-6 at 13. In Mr. Hill's May 8, 2013 Risk Assessment Review Report, the Risk Assessment Panel noted Mr. Hill's improved control of his assaultive behavior with involuntary medication. *Id.* The panel again emphasized that Mr. Hill "continued, however, to engage in a number of other maladaptive behaviors which reflect his severe personality disorder and proclivity for drug abuse: i.e. misuse of medication; lying; insolence; and phone abuse." *Id.* The report described Mr. Hill's "history of prescription drug diversion and abuse (i.e. diverting Artane and Wellbutrin, for purposes of crushing and as snorting as inhalant)." *Id.* at 10; *see also id.* at 13, 15 (discussing Mr. Hill's abuse of prescription medication by "snorting" it). Because of his improvement after involuntarily taking medication, however, the panel recommended Mr. Hill's conditional release. *Id.* at 16.

When Mr. Hill was yet again returned to federal custody a year later after assaulting the federal officer,[2] Mr. Hill was housed by BOP at the Federal Correctional Institution, Sheridan (Sheridan), instead of at a medical facility like before. At Sheridan, Mr. Hill was housed in the jail unit, for pretrial detainees. This is a general population unit.

---

[2] In that intervening year he had repeatedly been detained in jail for violating the terms of his conditional release until his violation hearing could be held but had not been returned to a federal facility.

BOP previously had classified Mr. Hill as a Care Level 4 (Care4-MH: Inpatient Psychiatric Care) patient because of his mental health issues, which is the highest category of care. His classification had not been changed after he returned to custody in 2014. Care Level 4 patients require "acute care in a psychiatric hospital and cannot function in general population." ECF 78-22 at 9. Care Level 3 (Care3-MH: Enhanced Outpatient Mental Health Care or Residential Mental Health Care) patients require enhanced outpatient care such as weekly mental health interventions, or residential mental health care. *Id.* at 8-9. Care Level 2 (Care2-MH: Routine Outpatient Mental Health Care or Crisis-Oriented Mental Health Care) patients, on the other hand, require routine outpatient mental health care on an ongoing basis or brief, crisis-oriented mental health care such as suicide watch. *Id.* at 8. The BOP's Undetermined Death Review[3] on Mr. Hill noted that he should have been reclassified as Care Level 3 upon his conditional release from Springfield. ECF 78-2 at 7. Mr. Hill, however, remained classified at Care Level 4 until his death. He was not housed in an inpatient (Care Level 4) or residential (Care Level 3) facility. Nor did he receive the enhanced outpatient psychiatric services required for a Care Level 3 patient. Indeed, some of his evaluations did not even recommend routine ongoing care at the Care Level 2 level.

BOP placed Mr. Hill at Sheridan on or about October 24, 2014. *See, e.g.*, ECF 65-1 at 6. His first psychiatric visit for which the Court has records was on November 5, 2014. Mr. Hill was referred to psychology services by a corrections officer for invading the personal space of a nurse. ECF 78-14. He was seen by Dr. Peter Le, who did not recommend any follow up. Mr. Hill was next seen on November 10, 2014, after requesting placement in the Special Housing Unit

---

[3] The BOP had the Undetermined Death Review completed by Dr. Robert Nagle, National Suicide Prevention Coordinator, Central Office, and Gerald Del Re, Correctional Services Specialist, Western Regional Office.

(SHU) and reporting that he had been "jumped" by Native Americans. ECF 78-15. Dr. Le again

saw Mr. Hill, this time noting some of Mr. Hill's psychological history and that he was a Care

Level 4 patient. Dr. Le concluded: "No follow-up is necessary other than routine SHU Review

protocol." *Id.*

The relevant housing policy in effect at the time of Mr. Hill's incarceration in 2014

and 2015 stated the following as a reason for placement in the SHU:

> (c) *Removal from general population*. Your presence in the general
> population poses a threat to life, property, self, staff, other inmates,
> the public, or to the security or orderly running of the institution
> and:
>
>> (1) Investigation. You are under investigation or awaiting a
>> hearing for possibly violating a Bureau regulation or
>> criminal law;
>>
>> (2) Transfer. You are pending transfer to another institution
>> or location;
>>
>> (3) Protection cases. You requested, or staff determined
>> you need, administrative detention status for your own
>> protection[.]

ECF 91-2 at 3-4 (Policy 5270.10, effective August 1, 2011).

For two weeks beginning November 10, 2014, Mr. Hill was housed in the SHU. Mr. Hill

had requested protective custody and "checked" himself in, reporting that he felt threatened.

ECF 78-2 at 5. In the BOP's Undetermined Death Review, the agency noted that "unfortunately"

a threat assessment was not done then and so it is unclear whether Mr. Hill's fears "were

legitimate or he experienced an increase in paranoia." *Id.*

Two weeks after Mr. Hill "checked" himself into the SHU, on November 25, 2014,

Dr. Alexander Horwitz performed a psychiatric assessment of Mr. Hill. ECF 78-28. Dr. Horwitz

described Mr. Hill's self-reports of not having any symptoms, not having self-injurious thoughts,

not having thoughts of harming others, and not feeling suicidal. *Id.* at 1. Dr. Horwitz appeared to

accept those self-reports, despite listing that Mr. Hill was a Care Level 4 patient and had a history of hospitalization while in custody and a history of self-injurious behavior. *Id.* at 2.

It also does not appear that Dr. Horwitz considered Mr. Hill's recent reports of threats or possible increase in paranoia that led to his housing in the SHU. Dr. Horwitz noted Mr. Hill for a follow up examination in three months, on February 25, 2015. *Id.* at 3. On November 26, 2014, Mr. Hill's mother called and requested an update on his mental health after Mr. Hill sent her a letter. ECF 78-16. Dr. Le advised her that Mr. Hill had been in the clinic the day before. Dr. Le did not mention that Mr. Hill was being transferred that day because of upcoming court proceedings. *Id.*

Mr. Hill was screened at Sheridan's psychology services when he returned to Sheridan on January 15, 2015. ECF 78-18. The intake screener found Mr. Hill stable and appropriate for general population, with no follow-up necessary. *Id.* Mr. Hill was next seen on January 23, 2015 and January 29, 2015, for routine visits based on his Care Level status. ECF 78-19 and 78-20. In nearly identical reports, BOP's psychology services clinical department accepted his self-report that he was "doing fine" and did not recommend any follow up other than routine monitoring. *Id.*

Mr. Hill was again transferred for court hearings on February 5, 2015. When he returned, after his February 2015 plea agreement, Mr. Hill was given a general medical and psychological screening. Dr. Peter Le performed the psychological screening on February 19, 2015. ECF 66-1 at 7. Dr. Le recited Mr. Hill's previous two suicide attempts but noted that Mr. Hill "denied any current suicidal ideation and agreed to contact staff if he becomes suicidal." *Id.* Dr. Le found Mr. Hill's mental status to be "within normal limits and absent of any gross psychopathology" and concluded that Mr. Hill "was deemed appropriate for placement in general population." *Id.* Despite Mr. Hill's "discharge diagnoses" in September 2013 of "schizoaffective disorder, bipolar

type, and personality disorder NOS with antisocial and borderline traits," Dr. Le believed that "[n]o follow-up is necessary at this time." *Id.* It is unclear whether Dr. Le considered Mr. Hill's many violations of the terms of his release, including those violations relating to mental health treatment and drug and alcohol abuse and particularly the violations that occurred in August 2014. It is also unclear whether Dr. Le considered: (1) Mr. Hill's many disciplinary violations during his custody in BOP, including for medication misuse; (2) Mr. Hill's history of medication noncompliance; or (3) that Mr. Hill required involuntary medication protocol.

BOP also had available for review in considering housing placement forms completed during Mr. Hill's transports to and from Multnomah County Jail and other facilities for court hearings. For example, Mr. Hill's U.S. Marshals Form 129 dated February 17, 2015 states that Mr. Hill is "psychotic/delusional/assaultive," has "mental probs/schizophrenia/paranoia," is "violent" and "assaultive towards other inmates" and should be left in restraints. ECF 78-34 at 17. Mr. Hill's U.S. Department of Justice Medical Summary of Federal Prisoner in Transit Form dated January 15, 2015 states that he has a "history of suicide attempt," "polysubstance abuse," "high risk medication use," "schizophrenia," "psychosis," and "depression." ECF 78-31 at 1.

After his evaluation on February 19, 2015, Mr. Hill was placed in general population with a cellmate, Rodney Tate, who had a "self-carry" prescription for 100mg of Zoloft (sertraline). Zoloft is a prescription medication, but not a "scheduled" drug by the Drug Enforcement Agency. At about 1:55 a.m. on February 27, 2015, Mr. Tate woke to find Mr. Hill nonresponsive and signaled an alarm. BOP staff at Sheridan unsuccessfully tried to revive Mr. Hill, first with a defibrillator that was missing its pads, then with a working defibrillator, then with CPR. *See* ECF 78-2 at 7. After an ambulance crew arrived, they also could not revive

Mr. Hill. He was pronounced dead at 2:45 a.m. An autopsy "ruled the manner of death as undetermined and cause of death as sertraline overdose." *Id.* at 1; *see also* ECF 78-3 at 1. Mr. Hill's Death Certificate lists his immediate cause of death as a sertraline (Zoloft) overdose and his "other significant condition contributing to death" as atherosclerotic heart disease. ECF 65-1 at 1.

Mr. Tate reported to the Federal Bureau of Investigation that on February 26, 2015, he was issued four bottles of Zoloft and when his bottles were returned to him after Mr. Hill's death, one of the bottles was empty. ECF 78-23 at 4. A photograph of the cell taken shortly after the incident shows four prescription bottles out in the open where Mr. Tate was storing his prescriptions. ECF 78-23 at 8. The BOP, however, explains that the empty pill bottle was from January 2015 and not February 2015. The date on the empty pill bottle supports this contention. ECF 78-23 at 15. The BOP concluded that "[t]his may mean that inmate Tate was misusing his medications." ECF 78-5 at 7. In other words, Mr. Tate may have been hoarding medication. It appears that Mr. Hill ingested some of Mr. Tate's Zoloft and overdosed, although the investigation as to the source of the Zoloft taken by Mr. Hill was inconclusive.

Mr. Hill had a blood level sertraline concentration of 6300 ng/mL. *See* ECF 78-4 at 5. In post-mortem examinations of 75 patients, blood level concentrations greater than 1500 ng/mL were found to be contributory to death. *Id.* On March 3, 2015, the United States moved to dismiss the indictment in both criminal cases because of Mr. Hill's death. The Court granted the motions.

## DISCUSSION

Defendant argues that Plaintiff's claim is barred by the discretionary function exception to the FTCA. Plaintiff responds that the discretionary function exception does not apply because Plaintiff has shown an issue of fact about whether the government's conduct violated the Eighth

Amendment of the United States Constitution, thus placing the alleged conduct outside the discretionary conduct exception. The parties also disagree on what standard of review applies to the Court's analysis of whether Plaintiff has sufficiently raised a constitutional claim to take Plaintiff's state law wrongful death claim outside the discretionary function exception—the standard that applies to a pretrial detainee or the standard that applies to a convicted prisoner. The Court first addresses this threshold issue. Finally, Defendant also argues, in the alternative, that even if the Court does not apply the discretionary function exception, Plaintiff fails to raise an issue of fact about whether Defendant's conduct was negligent.

**A.  Standard of Review (Pretrial Detainees versus Convicted Prisoners)**

Plaintiff argues that the standard of review for the Court in considering whether Defendant violated Mr. Hill's constitutional rights is the "purely objective" standard applied to claims under the Fourteenth Amendment, *Castro v. Los Angeles Cnty.*, 833 F.3d 1060, 1069 (9th Cir. 2016), rather than the "object and subjective" standard applied to Eighth Amendment claims. *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004). In Plaintiff's response to Defendant's motion for summary judgment, Plaintiff asserts that Mr. Hill was a pretrial detainee at the time of his death. Plaintiff cites the indictment of Mr. Hill charging him with assaulting a federal officer. Plaintiff argues that at the time of Mr. Hill's death, he was "awaiting adjudication on charges he violated his release and assaulted a federal officer."[4] Defendant responds that Mr. Hill had been in custody since 2002 and that he was in "holdover" status at the time of his death, which Defendant asserts is not a pretrial detainee status.

---

[4] There appears to be a scrivener's error in Plaintiff's brief. Plaintiff cites Exhibit 9, which is a Risk Assessment Review Report on Mr. Hill. The indictment on the charge of assaulting a police officer, Case No. 3:14-cr-410-SI, is Exhibit 10.

As described in the Background section above, at the time of his death, Mr. Hill had pleaded guilty but had not yet been sentenced. The question about the proper standard of review, therefore, is whether his guilty plea changed his status from that of a pretrial detainee to that of a convicted prisoner, which would warrant application of the standard of review for Eighth Amendment prisoner claims.

Many district courts in the Ninth Circuit have answered the question of whether a guilty plea changes the status of a pretrial detainee in the affirmative. *See, e.g.*, *Fitzpatrick v. Las Vegas Metro. Police Dep't*, 2020 WL 560582, at *11 (D. Nev. Feb. 3, 2020) ("Because Bowling pleaded guilty, he was no longer a pretrial detainee, and it is the Eighth Amendment that supplies the standard for the constitutional claims here."); *Hodges v. Corizon Health, Inc.*, 2019 WL 7476444, at *15 n.19 (D. Or. Sept. 10, 2019), *report and recommendation adopted*, 2020 WL 42791 (D. Or. Jan. 2, 2020), *aff'd*, 837 F. App'x 466 (9th Cir. 2020) ("The Fourteenth Amendment applies to pretrial detainees while the Eighth Amendment applies to individuals in custody after a conviction. Hodges was a pretrial detainee until July 16, 2013, when he entered a guilty plea." (citation omitted)); *Padgett v. Arpaio*, 2009 WL 3049579, at *3 (D. Ariz. Sept. 22, 2009) ("Defendant asserts that prior to the date of the incident at issue, Plaintiff had entered a guilty plea and was therefore a convicted inmate, not a pretrial detainee. Plaintiff offers no evidence to suggest that he was not a convicted inmate on the date in question. Accordingly, Plaintiff's allegations are properly considered under the Eighth Amendment excessive force standard." (citation omitted)); *In re Application of Hughes*, 2002 WL 31430321, at *1 (N.D. Cal. Oct. 25, 2002) ("When the petition was filed, he apparently was an arrestee or pretrial detainee, but on September 30, 2002, he entered a guilty plea. . . . [H]e is no longer a pretrial detainee and

now is a convict." (citations omitted)). The Court agrees with the conclusions reached in these cases.

The U.S. Supreme Court, in the context of considering class certification of pretrial detainees under the "capable of repetition yet evading review" exception to mootness, explained:

> Pretrial detention is by nature temporary, and it is most unlikely that any given individual could have his constitutional claim decided on appeal before he is either released or convicted. . . . The length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by release on recognizance, dismissal of the charges, or a guilty plea, as well as by acquittal or conviction after trial. It is by no means certain that any given individual, named as plaintiff, would be in pretrial custody long enough for a district judge to certify the class.

*Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975). The U.S. Supreme Court has also explained that "a plea of guilty is more than an admission of conduct; it is a conviction." *Boykin v. Alabama*, 395 U.S. 238, 242 (1969). A guilty plea changes the status of a criminal defendant to a convict and can "end[]" pretrial detainee status, as noted by the Supreme Court in *Gerstein*.[5] Thus, the Court agrees with the many other courts in this circuit that upon a guilty plea, even before sentencing, the applicable standard of review is the Eighth Amendment standard applicable to convicted prisoners, not the Fourteenth Amendment standard applicable to pretrial detainees.

---

[5] The Court also observes, as a matter of judicial notice, that when the undersigned accepted Mr. Hill's guilty plea on February 9, 2015, the undersigned stated, as a matter of the undersigned's routine practice in a plea colloquy, "[t]he plea is therefore accepted, and the defendant is now adjudged guilty of that offense." *See* Federal Judicial Center, *Benchbook for U.S. District Court Judges* § 2.01 (6th ed. 2013); *see also United States v. Hill*, Case No. 3:14-cr-410-SI, ECF 28.

**B. FTCA Discretionary Function Exception**

**1. Whether the Exception Applies in Eighth Amendment Cases**

The FTCA provides a limited waiver of the federal government's sovereign immunity from damages liability for torts committed by federal employees acting within the scope of their employment. *See* 28 U.S.C. §§ 1346(b), 2674. The FTCA expressly retains immunity from some tort liability through a number of statutory exceptions. *Id.* § 2680. If one of those exceptions applies, a court lacks subject-matter jurisdiction to hear a claim. *See Simmons v. Himmelreich*, 578 U.S. 1162, 136 S.Ct. 1843, 1847 (2016) ("[D]istrict courts do not have jurisdiction over claims that fall into one of the 13 categories of 'Exceptions' . . . .").

The discretionary function exception provides that the FTCA's waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. §2680(a). "The purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. Gaubert*, 499 U.S. 315, 323 (1991) (simplified).

Plaintiff argues that Defendant was negligent in placing Mr. Hill in Sheridan instead of a medical facility, assessing Mr. Hill upon his arrival at Sheridan, evaluating his psychological condition and significant psychological history, determining appropriate housing at Sheridan, and placing him in a cell with someone who had "self-carry medication," namely, Zoloft. Mr. Hill overdosed on Zoloft, which was the primary cause of his death. Plaintiff also argues that Defendant failed to follow BOP policies to adequately consider Mr. Hill's psychological condition upon his arrival and properly house him.

Plaintiff details Mr. Hill's long and disturbing history within the BOP and related institutions. Plaintiff describes Mr. Hill's unstable mental health, including that he was found not guilty by reason of insanity and then committed by a federal judge as dangerous to the community, and that he was not provided with much psychiatric care at Sheridan. Plaintiff also emphasizes the fact that the defibrillator nearest to Mr. Hill's cell was nonfunctioning and unable to be used to revive Mr. Hill. That said, Plaintiff acknowledges that courts have concluded that housing decisions in prisons are discretionary decisions for purposes of the discretionary function exception. Plaintiff argues, however, that the negligent conduct described by Plaintiff rises to the level of a constitutional violation, thereby taking the conduct outside the discretionary function exception.

When a plaintiff asserts a claim against the United States under the FTCA, the claim necessarily is not a constitutional tort because constitutional torts are not cognizable under the FTCA. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 477-78 (1994). Nevertheless, as explained by the D.C. Circuit, that does not preclude a plaintiff from arguing that the United States may not assert the FTCA's discretionary function exception to jurisdiction over the state tort when the plaintiff argues that the conduct giving rise to the tort was egregious enough to be to a constitutional violation.

> The discretionary-function exception likewise does not shield decisions that exceed constitutional bounds, even if such decisions are imbued with policy considerations. *See Medina*, 259 F.3d at 225 (acknowledging, in reliance on *Berkovitz*, 486 U.S. at 536, 108 S. Ct. 1954, and *Red Lake*, 800 F.2d at 1196, that federal officials lack discretion to violate constitutional rights). A constitutional limit on governmental power, no less than a federal statutory or regulatory one like the FBI policy in *Red Lake*, circumscribes the government's authority even on decisions that otherwise would fall within its lawful discretion. The government "has no 'discretion' to violate the Federal Constitution; its dictates are absolute and imperative." *Owen v. City of Independence,*

> *Mo*., 445 U.S. 622, 649, 100 S. Ct. 1398, 63 L. Ed. 2d 673 (1980).
> Indeed, the absence of a limitation on the discretionary-function
> exception for constitutionally ultra vires conduct would yield an
> illogical result: the FTCA would authorize tort claims against the
> government for conduct that violates the mandates of a statute,
> rule, or policy, while insulating the government from claims
> alleging on-duty conduct so egregious that it violates the more
> fundamental requirements of the Constitution.

*Loumiet v. United States*, 828 F.3d 935, 944-45 (D.C. Cir. 2016).

The D.C. Circuit described its holding and those of other circuits, including the Ninth

Circuit:

> We hold that the FTCA's discretionary-function exception does
> not provide a blanket immunity against tortious conduct that a
> plaintiff plausibly alleges also flouts a constitutional prescription.
> At least seven circuits, including the First, Second, Third, Fourth,
> Fifth, Eighth, and Ninth, have either held or stated in dictum that
> the discretionary-function exception does not shield government
> officials from FTCA liability when they exceed the scope of their
> constitutional authority. In *Nurse v. United States*, for example, the
> Ninth Circuit held that "in general, governmental conduct cannot
> be discretionary if it violates a legal mandate," including a
> constitutional mandate. 226 F.3d 996, 1002 (9th Cir. 2000). The
> discretionary-function exception was inapplicable, that court
> explained, because the plaintiff had alleged tort claims based on
> "discriminatory, unconstitutional policies which the defendants
> had no discretion to create." *Id*. Likewise, the Eighth Circuit in *Raz
> v. United States* held that the FBI's "alleged surveillance activities
> fell outside the FTCA's discretionary-function exception" where
> the plaintiff had "alleged they were conducted in violation of his
> First and Fourth Amendment rights." 343 F.3d 945, 948 (8th
> Cir. 2003); *see also, e.g.*, *Limone v. United States*, 579 F.3d 79,
> 102 (1st Cir. 2009) (holding that challenged "conduct was
> unconstitutional and, therefore, not within the sweep of the
> discretionary function exception"); *Medina v. United States*, 259
> F.3d 220, 225 (4th Cir. 2001) (In "determining the bounds of the
> discretionary function exception we begin with the principle that
> federal officials do not possess discretion to violate constitutional
> rights or federal statutes."); *U.S. Fid. & Guar. Co. v. United
> States*, 837 F.2d 116, 120 (3d Cir. 1988) ("Conduct cannot be
> discretionary if it violates the Constitution, a statute, or an
> applicable regulation. Federal officials do not possess discretion to
> violate constitutional rights or federal statutes."); *Sutton v. United
> States*, 819 F.2d 1289, 1293 (5th Cir. 1987) ("Action does not fall

> within the discretionary function exception of § 2680(a) when governmental agents exceed the scope of their authority as designated by statute or the Constitution."); *Myers & Myers Inc. v. USPS*, 527 F.2d 1252, 1261 (2d Cir. 1975) ("It is, of course, a tautology that a federal official cannot have discretion to behave unconstitutionally or outside the scope of his delegated authority.").

*Id.* at 943 (simplified).

The issue, therefore, with respect to Defendant's assertion of the FTCA discretionary function exception, is whether there is an issue of fact that Defendant's conduct violated the Eighth Amendment.[6] If so, then the Court cannot apply the discretionary function exception, and the Court may not grant summary judgment in favor of the United States. The Court next discusses whether Plaintiff raises an issue of fact on Plaintiff's Eighth Amendment contention.

### 2. Whether Plaintiff has Shown a Factual Dispute on Defendant's Purported Eighth Amendment Violation

To establish an Eighth Amendment violation under § 1983 a convicted prisoner must satisfy "both the objective and subjective components of a two-part test." *Toguchi*, 391 F.3d at 1057 (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)). First, the prisoner must show that the prison official deprived him of the "minimal civilized measure of life's necessities." *Id.* (quotation marks and citation omitted). Second, the plaintiff must show that the prison official "acted with deliberate indifference in doing so." *Id.* (quotation marks and citation omitted).

---

[6] At oral argument, counsel for Defendant argued that Plaintiff's challenge to Defendant's application of the discretionary function exception also fails because Plaintiff does not sufficiently allege that the United States violated Mr. Hill's constitutional rights in the Amended Complaint. Plaintiff's claim for wrongful death against the United States, however, incorporates by reference all of the preceding allegations. Am. Compl. ¶ 49 (ECF 24). In the preceding allegations, Plaintiff specifically alleges deliberate indifference by BOP personnel resulting in a violation of the Eighth Amendment.

PAGE 18 – OPINION AND ORDER

Defendant argues that Plaintiff fails to show an issue of fact that any employee of the BOP knew of and disregarded an excessive risk to Mr. Hill's health. Thus, contends Defendant, Plaintiff cannot show a constitutional violation and cannot defeat the discretionary exception to the FTCA.

Plaintiff responds that the BOP acted with deliberate indifference in placing Mr. Hill at Sheridan, and in placing him into the general population, particularly with a cellmate who had a self-carry prescription. The BOP knew about Mr. Hill's serious mental health issues and problems with crushing and inhaling and otherwise abusing prescription medications.

To support summary judgment, Defendant mainly relies on the declaration of James K. Pelton, the Western Regional Medical Director of the BOP, who provides both expert and percipient witness testimony. ECF 66. Mr. Pelton contends that the staff at Sheridan did nothing wrong in placing Mr. Hill in the general population. Mr. Pelton notes that pretrial detainees typically are placed in a general population unit. *Id.* at 6. Referencing Plaintiff's argument that Mr. Hill should have been placed in the SHU, Mr. Pelton disagrees. He asserts that based on the information in Mr. Hill's record and SHU Policy 5270, nothing in Mr. Hill's record shows that he was an *immediate* or *serious* danger to himself, others, or the orderly administration of the facility. *Id.* at 6-7. The specific housing policy relied on by Mr. Pelton requiring that Mr. Hill be an *immediate* or *serious* danger, however, was not in effect at the relevant time. Thus, Mr. Pelton's testimony on this point is not relevant and does not help the Court.

Contrary to Mr. Pelton's testimony, the SHU policy in effect at Mr. Hill's death, Policy 5270.10, was not so limiting in relation to housing persons with mental health challenges. The policy specifically allowed BOP to house persons in the SHU who posed a threat to themselves, staff, other inmates, or the orderly running of the institution and, among other things,

who were awaiting a hearing for violating criminal law (Mr. Hill was awaiting his sentencing

hearing) or were "protection cases" that need SHU housing for their protection (such as from

conduct like compulsively crushing and inhaling medication or other potentially self-injurious

conduct).

Mr. Pelton also states that "[p]sychiatric medications are not self-carry by BOP inmates

unless they are known to be safe when taken in excessive amounts." ECF 66 at 10. He explains

that Zoloft is not a "scheduled" medication by the Drug Enforcement Agency and that he is

unaware of any cases in which it has been alleged to have contributed to death, other than

Mr. Hill. *Id.* NMS Labs, which performed the toxicology analysis and prepared the report at the

direction of BOP after Mr. Hill's death, described that sertraline (the main active ingredient in

Zoloft) was found to have contributed to death in at least 75 cases. *See* ECF 78-4 at 5. The

BOP's Undetermined Death Review also states that "Mr. Hill ingested a lethal dose of sertraline

(more than four times *what is considered contributory to death*)." ECF 78-2 at 6 (emphasis

added). Thus, the BOP had knowledge that there is a level of sertraline that is considered

contributory to death. The Undetermined Death Review also emphasized the many "serious"

suicide attempts and abuse of prescription medication by Mr. Hill while in BOP custody,

including in 2011, 2012, and 2013. *Id.* at 4.

The Ninth Circuit has explained deliberate indifference in the context of inmate safety:

> In *Farmer v. Brennan*, 511 U.S. 825, 114 S. Ct. 1970, 128 L.
> Ed. 2d 811 (1994), the Supreme Court outlined the standard for
> Eighth Amendment liability for acting with "deliberate
> indifference" to inmate safety. At the outset, the Court rejected the
> "invitation to adopt an objective test for deliberate indifference."
> *Id.* at 837, 114 S. Ct. 1970. To prove deliberate indifference,
> subjective recklessness is required, that is, an official "cannot be
> found liable under the Eighth Amendment for denying an inmate
> humane conditions of confinement unless the official knows of and
> disregards an excessive risk to inmate health or safety; the official

> must both be aware of facts from which the inference could be
> drawn that a substantial risk of serious harm exists, and he must
> also draw the inference." *Id.* Constructive notice does not suffice to
> prove the requisite knowledge, but "[w]hether a prison official had
> the requisite knowledge of a substantial risk is a question of fact
> subject to demonstration in the usual ways, including inference
> from circumstantial evidence." *Id.* at 841-42, 114 S. Ct. 1970.

*Harrington v. Scribner*, 785 F.3d 1299, 1303-04 (9th Cir. 2015).

Deliberate indifference may occur when the need for more or different action "is so

obvious, and the inadequacy [of the current procedure] so likely to result in the violation of

constitutional rights, that the policymakers . . . can reasonably be said to have been deliberately

indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). A plaintiff must put

forth evidence that the defendant "disregarded a known or obvious consequence of [its] action"

*Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *Board of Comm'rs of Bryan Cnty. v.

Brown*, 520 U.S. 397, 410 (1997)).

The Ninth Circuit has emphasized "the significance of the obviousness of a risk in a

deliberate indifference calculus." *Harrington*, 785 F.3d at 1304.

> Our cases support the proposition that obviousness of a risk may
> be used to prove subjective knowledge . . . . *See Lemire v. Cal.*
> *Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013)
> (requiring a plaintiff to demonstrate "that the risk was obvious or
> provide other circumstantial or direct evidence that the prison
> officials were aware of the substantial risk" to defeat summary
> judgment); *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010)
> (noting that subjective awareness "may be satisfied if the inmate
> shows that the risk posed by the deprivation is obvious").

*Id.*

As discussed above, BOP had extensive records about Mr. Hill's serious suicide attempts,

problems with medication abuse (including crushing and inhaling medication), serious mental

health problems, and that he was classified as a Care Level 4 inmate. As a Care Level 4 inmate,

he was supposed to be housed in an inpatient facility, not Sheridan and certainly not in a general

population unit. Further, even if Mr. Hill had been classified as a Care Level 3 inmate, he was supposed to be either housed in a residential treatment facility or given enhanced psychiatric care, neither of which was provided.

Of particular concern is BOP's well-documented awareness of Mr. Hill's repeated problems abusing prescription medication. *See, e.g.*, ECF 78-2 at 6 ("Mr. Hill had a lengthy history of illicit and prescription substance abuse. On multiple occasions he was known to crush and inhale prescribed medications."); 78-6 at 20 ("Though Mr. Hill had hitherto consistently denied diverting and abusing medication at the time of the incident, he did acknowledge to the Risk Assessment Panel that he had in fact diverted his medication the day prior to the incident, subsequently cut it up into a powder, and then 'snorted' it up his nose. . . . Mr. Hill has a long, well-established history of drug abuse, both in the community, and in custody."). BOP records specifically describe that Mr. Hill "snorted" most of his various prescription medications, including Artane, Wellbutrin, and Depakote. *See, e.g.*, 78-6 at 10-11.

BOP also knew that prisoners had no way to lock up or secure their own self-carry medication, which would provide Mr. Hill with access to any cellmate's prescription medication, or potentially other inmate's medication. *See, e.g.*, ECF 78-2 at 6 ("At the FDC, inmates do not have the ability to purchase locks through commissary. . . . Given the increasing prevalence of inmates with self-carry medications each inmate needs an area in their cell in which to secure medications. New lockers or bins with a lid and hole to attach a lock are recommended."); ECF 78-23 at 4 ("Case Manager Mark Evans was interviewed and stated inmates housed at the Federal Detention Center are not allowed to have combination padlocks, so they do not have any way to secure their self-carry medication. So it would be possible for a cellmate, or any other inmate for that matter, to obtain another inmate[']s prescribed self-carry medications."). Despite

all this specific knowledge, Sheridan officials did not take any precaution to house Mr. Hill away from self-carry medications or in the SHU.

The Supreme Court has explained that evidence that prison officials "expressly noted" the risk "in the past" and "the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it" can "permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer v. Brennan*, 511 U.S. 825, 842-43 (1994). BOP personnel repeatedly described the risk that Mr. Hill would crush and inhale most any prescription medication. Sheridan personnel had access to all of Mr. Hill's BOP records. Viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could conclude that the circumstances support that the relevant Sheridan personnel were exposed to this information and thus had actual knowledge of the risk, but disregarded that risk in housing Mr. Hill. *See id.* This is enough to defeat summary judgment on Plaintiff's argument that the evidence created a triable issue of an Eighth Amendment violation, sufficient to preclude the discretionary function exception at this stage.

Alternatively, viewing the facts in the light most favorable to Plaintiff, a reasonable factfinder could also find that the risk of an inmate with Mr. Hill's specific background being seriously harmed or killed from being placed in general population without sufficient psychiatric support, including from crushing and inhaling prescription medication, is so obvious that the Sheridan officials had the requisite subjective knowledge. *Harrington*, 785 F.3d at 1304. This also raises an issue of fact precluding summary judgment on whether Defendant acted with deliberate indifference.

BOP argues that denying summary judgment here would require a complete change in prison housing policy to house potentially vulnerable inmates away from inmates with self-carry

medications. Few inmates, however, are likely have the unique history of Mr. Hill—someone who has been in BOP psychiatric care for decades and for whom BOP has extensive records on serious psychiatric conditions as well as being known to crush and inhale various prescription medications.

## C.  Reasonable Foreseeability

Defendant argues that even if there is an issue of material fact about whether FTCA discretionary function applies, the Court should still grant summary judgment against Plaintiff's wrongful death claim. Defendant asserts that it was not reasonably foreseeable that placing Mr. Hill in a cell with an inmate who had a self-carry prescription for Zoloft would lead to Mr. Hill's death. Defendant asserts that because Dr. Pelton was unaware of any inmate who died from a Zoloft overdose, then it was not reasonably foreseeable that Defendant's conduct would lead to Mr. Hill's death.

Under the unique facts of this case, the Court finds that a reasonable factfinder could conclude that it was reasonably foreseeable that Defendant's housing decisions relating to Mr. Hill could lead to his death. As discussed above, Defendant knew about Mr. Hill's: (1) serious mental health problems; (2) multiple serious suicide attempts; (3) need for placement on involuntary medication; and (4) drug abuse, particularly misuse of prescription medication. Defendant also knew that Mr. Hill (1) could not be around self-carry medications, (2) had on "multiple occasions" crushed and inhaled prescription medications, and (3) that self-carry medications of cellmates were not locked or otherwise safely stored. Additionally, Defendant knew that Mr. Hill was a Care Level 4 inmate, meaning he was supposed to be housed in an inpatient hospital facility. Even if he had been designated a Care Level 3 inmate, he was supposed to receive more psychiatric support than he received, including "enhanced" care of at least weekly mental health interventions, based on BOP regulations. There is no record that he

received any psychiatric care before his death after his February 19, 2015 entry screening. A reasonable factfinder could conclude that it was reasonably foreseeable that putting an inmate with Mr. Hill's specific background of mental health issues and medication abuse in general population and without the required psychiatric support could lead to his death. Further, regardless of Dr. Pelton's individual knowledge, the record shows that BOP had knowledge that a Zoloft overdose could contribute to death.

## CONCLUSION

The Court DENIES Defendant's Motion for Summary Judgment (ECF 63).

**IT IS SO ORDERED.**

DATED this 24th day of September, 2021.

 _/s/ Michael H. Simon_
Michael H. Simon
United States District Judge